IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KRISTY TANAKA, | ) | Civ. No. 20-00205 SOM-RT |
| | ) | |
| Plaintiff, | ) | ORDER DENYING PLAINTIFF'S |
| | ) | MOTION FOR SUMMARY JUDGMENT; |
| vs. | ) | ORDER GRANTING IN PART AND |
| | ) | DENYING IN PART DEFENDANT'S |
| DEREK KAAUKAI, | ) | COUNTER MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| Defendant. | ) | |
| _____ | ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT;
ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S COUNTER MOTION FOR SUMMARY JUDGMENT**

**I.       INTRODUCTION.**

In January 2018, J.B., a minor female, told Defendant
Detective Derek Kaaukai of the Maui Police Department that
Christopher Grindling had kidnapped, sexually assaulted, and
recorded her giving him "head" on his cellular phone.  J.B. told
Kaaukai that Grindling had all sorts of "porn stuff" on his
phone.  Kaaukai then applied for and received a state-court
search warrant authorizing police to search for and seize
Grindling's electronic devices.  When police executed the search
warrant at Grindling's home, Plaintiff Kristy Tanaka, who
apparently was living with Grindling, was briefly seized and had
her cellular telephones seized pursuant to the initial warrant.
Her phones were subsequently searched pursuant to a second state-
court warrant.

This case is not about whether Grindling actually sexually assaulted or kidnapped J.B.  In fact, it does not appear that charges were ever brought against Grindling for the alleged kidnappings and sexual assaults.  Instead, the case turns on whether Kaaukai properly asked for and received the warrants to look for evidence of those crimes.  This court previously dismissed parts of Tanaka's Amended Complaint, leaving for further adjudication Tanaka's individual capacity Fourth Amendment claim for an illegal search and seizure and Fifth Amendment claim relating to Tanaka's alleged compelled provision of the passcode for her phones without *Miranda* warnings.  *See* ECF No. 43, PageID #s 254–55.

On March 29, 2021, Tanaka, proceeding *pro se*, filed a motion for partial summary judgment with respect to Kaaukai's liability on her remaining claims.  *See* ECF No. 60.  On April 19, 2021, Kaaukai filed an Opposition and what this court deemed to be a counter motion for summary judgment.  *See* ECF Nos. 63 and 65.  The court denies Tanaka's motion and grants in part and denies in part Kaaukai's motion.  A question of fact precludes summary judgment with respect to Tanaka's Fifth Amendment claim, as there is a question of fact on the present record as to whether Kaaukai was personally involved in getting the passcode

to Tanaka's phones.[1]  However, Kaaukai has qualified immunity with respect to Tanaka's Fourth Amendment claims, as he relied on search warrants issued by state-court judges in conducting the search of Tanaka's residence, briefly seizing her during the execution of the warrant, seizing her phones, and then searching the contents of her phones.  Kaaukai is therefore granted summary judgment with respect to the Fourth Amendment claims asserted against him in his individual capacity.

II.      **BACKGROUND.**

       **A.   Factual Background.**

       Kaaukai is a detective with the Maui Police Department. *See* Decl. of Derek Kaaukai, ECF No. 64-1, PageID # 442 (indicating that Kaaukai is employed by the Maui Police Department); Affidavit in Support of Search Warrants by Derek Kaaukai, ECF No. 64-3, PageID # 453 (indicating that he is a detective).

       Kaaukai says that, on January 12, 2018, he spoke with J.B., a minor in the custody of the Hawaii Youth Correctional Facility.  *See* Kaaukai Decl. ¶ 41, ECF No. 64-1, PageID # 448. J.B. told Kaaukai that Christopher Grindling had sexually

---

[1] Kaaukai does not argue in his motion that no *Miranda* warnings were necessary.  Accordingly, this court only examines whether he was personally involved with obtaining the passcode from Tanaka without the provision of *Miranda* warnings.

assaulted her on two occasions through penile/vaginal penetration.  *See* Kaaukai Decl. ¶¶ 10, 12, ECF No. 64-1, PageID # 444.  Kaaukai says that J.B. orally identified Grindling as her assailant and also picked him out of a photo line up.  *See id.* ¶¶ 13, 14.  J.B. told Kaaukai that Grindling had told her that she could not leave.[2]  *See id.* ¶ 15.  J.B. told Kaaukai that Grindling had numerous videos on his phone of girls doing "porn stuff" and that she believed she was in such a video because Grindling had put his phone in a car's drink holder with the camera facing them as she was giving him "head."[3]  *See id.* ¶¶ 29-31, PageID # 447.

Kaaukai says that, based on his training and experience, sexual offenders use their cellular phones to record sexual acts, storing the videos for years and even transferring them to new phones.  *See id.* ¶ 35, PageID # 447.

Kaaukai applied for and received search warrants for Grindling's home and person to seize Grindling's phone(s), which he believed would contain evidence of J.B.'s sexual assaults and

---

[2] There is no dispute that J.B. was a minor at the time of her interview with Kaaukai, meaning that she was also a minor at the time of the alleged sexual assaults and kidnappings.

[3] The court describes statements made to the police to demonstrate what information the police relied on in obtaining the warrants at issue, not to establish any factual contention made in the statements.

kidnappings.  Kaaukai says the facts supporting probable cause for the search warrants are contained in his Affidavit in Support of Search Warrants, ECF No. 64-3.

On April 16, 2020, at about 6:23 a.m., police executed the search warrants at Grindling's home in Kahului on the island of Maui.  *See* Kaaukai Decl. ¶ 45, PageID # 448.  Several cell phones were seized as a result.  *See id.* ¶ 46, PageID # 449. There is no dispute that Tanaka's phones were seized pursuant to the search warrant, as she was in the home at the time the search warrants were executed and the police could not definitively determine whether any or all of the phones belonged to Grindling. Moreover, Kaaukai believed that Grindling might have had access to Tanaka's phones.  *See id.* ¶ 47.  Nor is there any dispute that, as described in this court's earlier orders, state-court judge Adrianne Heely subsequently issued Search Warrant No. SW2020-167 allowing a search of the contents of Grindling's and Tanaka's seized cellular telephones.  *See* ECF No. 23-5.

While Tanaka does not dispute that the search and seizures were conducted pursuant to search warrants, she contends that Kaaukai lied in the search warrant applications.  She says J.B. told her no sexual assault or kidnapping occurred.  *See* ECF

No. 34, PageID #s 187, 189.  Tanaka extrapolates that Kaaukai must have lied in the search warrant applications.

Tanaka also alleges that, during the execution of the search warrants, an unidentified officer dragged her out of bed, pointed a gun at her head, and handcuffed her while her home was searched.  *See* ECF No. 34, PageID # 188.  Tanaka's Amended Complaint alleges under penalty of perjury that Tanaka was directed to provide police with the passcode to her three phones even though no one read her any *Miranda* rights.  *See* ECF No. 34, PageID # 188 ("Only Derek Kaaukai's name was on the documents. He directed me to turn over the passwords to unlock my phone."); *Id.*, PageID # 189 ("I declare under penalty of perjury the foregoing is true.").  Tanaka therefore appears to be alleging that she was subject to a custodial interrogation without first being provided *Miranda* warnings.

Kaaukai seeks summary judgment, arguing that he was not personally involved with obtaining the passcode and never asked Tanaka for any passcode.  *See* Kaaukai Decl. ¶¶ 42, 43, ECF No. 64-1, PageID # 448.  Instead, he identifies Detective LeeAnn Galario-Guzman as the person who asked Tanaka for the passcode. *Id.* ¶ 37, PageID # 447; ECF No. 64-3, PageID # 431 (Incident/Investigation Report listing the full name of Detective

Galario-Guzman).  At the hearing on the motion, Tanaka clarified
that a woman officer, not Kaaukai, had asked her for the
passcodes to her three phones.  A single passcode unlocked all
three phones.  However, Tanaka said at the hearing on the present
motions that she heard Kaaukai tell Grindling that Tanaka had to
turn over the passcode.  Tanaka additionally indicated at the
hearing that, although she did not hear Kaaukai instructing the
woman officer to get the passcode, the woman officer told Tanaka
that it was Kaaukai who was demanding the passcode to the
phones.[4]  Tanaka is therefore arguing that Kaaukai indirectly
ordered her to turn over the passcode to her phones.

Because this court must interpret the facts in the
light most favorable to Tanaka for purposes of Kaaukai's motion
for summary judgment, the court assumes that Tanaka was in
custody when she was asked to provide her passcode, possibly

---

[4] While Tanaka's statements at the hearing were not made under
penalty of perjury, those statements "could be presented in an
admissible form at trial," meaning that this court may consider
them with respect to the present motions for summary judgment.
*See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003)
("Because the diary's contents could be presented in an
admissible form at trial, we may consider the diary's contents in
the Bank's summary judgment motion.").  What Kaaukai allegedly
said is not hearsay as it is a statement of a party opponent.
*See* Fed. R. Evid. 801(d)(2).  Accordingly, Tanaka's testimony
about what she heard Kaaukai say to Grindling would not involve
hearsay.  Additionally, Tanaka's account of what Detective
Galario-Guzman said Kaaukai instructed her to do might not
involve hearsay.  For example, Galario-Guzman might have been
acting as Kaaukai's agent.

triggering the need for *Miranda* warnings.  Exactly what, if anything, Kaaukai said with respect to getting the passcode. and what the circumstances were cannot be determined from the record.

### B.   Search Warrant Applications.

On or about April 14, 2020, Kaaukai submitted an Affidavit in Support of Search Warrants Nos. SW2020-0165 and SW2020-0166.  *See* ECF No. 64-3.  This affidavit described the factual background for the state-court judge assigned to determine whether probable cause supported issuance of the requested search warrant.  This court here describes the factual background provided to the state-court judge only to detail what was told to the judge, not to establish the truth of those allegations.

J.B. was in the custody of the Hawaii Youth Correctional Facility on Oahu.  J.B. told the therapist at that facility, Kristine Rodriguez, that she had been raped by her "pimp," Grindling, from November 2016 through January 2017, when J.B. was 16.  *See* ECF No. 64-3, PageID #s 457, 459.  Apparently, Rodriguez reported the alleged sexual assaults to the police.

On January 12, 2018, J.B. told police investigating the alleged sexual assaults that Grindling had picked her up in

November 2016, offering to give J.B. a ride home.  Grindling
supposedly gave J.B. crystal methamphetamine, alcohol, and
Oxycontin.  He then allegedly began touching her vagina over her
clothing despite J.B.'s objections.  J.B. said that Grindling
"took off her clothes, backhanded her in the face[,] and told her
that she couldn't leave."  He then allegedly raped her by
"putting his 'dick' in her 'vagina.'"  Grindling then allegedly
told J.B. that he "owned her."  *See* ECF No. 64-3, PageID # 458.

J.B. told police that, sometime in January 2017,
Grindling again picked her up in a car, and, when they parked, he
began choking her.  She told police that Grindling ripped off her
clothes, put on a condom, held her down, and "put his penis in
her vagina."  *See id.*  J.B. said that, when it was over, they
picked up "Kristi," which is apparently a reference to Tanaka.

Tanaka allegedly told J.B. that Grindling found "work"
for girls.  J.B. said that she saw Tanaka enter a guy's car at a
bakery in Wailuku and that the guy then got out of the car and
gave Grindling money and marijuana before leaving with Tanaka for
a hotel in Kihei.  *See* ECF No. 64-3, PageID # 458.  When asked
whether Grindling ever gave her anything in exchange for sex,
J.B. said that he gave her $100 and an ounce of marijuana after

the first incident, and $50 and an "eight ball of dope" after the second.  *See id.*, PageID # 459.

J.B. told police that Grindling had "plenty of videos on his phone" of girls doing "porn stuff."  J.B. said she saw a video on Grindling's phone of a girl who looked 15 or 16.  J.B. said she thought Grindling had a video of her giving him "head" because she saw him put his phone in the vehicle's cup holder with the camera facing them.  J.B. said she was raped twice, but gave him "head" more than twice because he would grab her if she refused.  *See id.*

The affidavit in support of the search warrants stated that J.B. had picked Grindling out of a photo line-up.  *See id.*

Kaaukai stated that, based on his training and experience in investigating sexual assaults, "it is known that offenders often utilize their cellular telephones to record sexual acts that they commit and store it on the device for years after it was recorded.  They also transfer the material/data to newer or upgraded cellular phone(s)."  *See id.*, PageID # 460.

## C.  Search Warrants

This court discussed the search warrants at issue in its order of August 28, 2020:

> Search Warrant Nos. SW2020-165 and SW2020-166 are actually a single search warrant signed

by Judge Blaine J. Kobayashi on April 14, 2020.  This warrant allowed police to search for an "Unknown brand cellular telephone being utilized by one Christopher Grindling" on his person or at his residence in Kahului, Maui.  The object of the search was evidence relating to an alleged sexual assault and kidnapping.  The search was not to be conducted between 10:00 p.m. and 6:00 a.m. *See* ECF No. 23-3, PageID #s 124-26.

The return of service for Search Warrant Nos. SW2020-165 and SW2020-166 indicates that the warrants were executed on April 16, 2020, at 6:23 a.m., and that the police seized the following:

    1)   A1532 model iPhone White lower
         left corner of bed or floor

    2)   iPhone silver A1633 clear case
         with sparkles same location as
         item #1

    3)   A1662 silver iPhone located to
         right of bed

    4)   A1633 silver iPhone located to
         right of bed

    5)   DVD Zosi surveillance system
         w/ power cord left side

    6)   Suspected marijuana in jar to
         right of bed

    7)   Hard drive under staircase
         Dell Inspiron

ECF No. 23-4, PageID # 129. . . .

Tanaka appears to have lived at the address listed in the search warrant, as the address listed on her Complaint is identical

11

> to the address in the search warrant.
> Apparently, Tanaka's phone(s) were seized
> along with Grindling's phone(s), perhaps
> because the police could not tell which
> phone(s) belonged to Grindling and which
> phone(s) belonged to Tanaka.
>
> The police then obtained a second
> warrant, signed by Judge Adrianne N. Heely on
> April 20, 2020.  This warrant, No. SW 2020-
> 0167, allowed police to search Tanaka's and
> Grindling's cellular phones, which the police
> were holding following the earlier search and
> seizure.  *See* ECF No. 23-5, PageID #s 131-39.
> The return of service for this warrant
> indicates that data was extracted from the
> phones.  This return of service was signed by
> Kaaukai.

ECF No. 33, PageID #s 172-74.

Tanaka does not contest that the search warrants were issued or that she and her phones were seized and her phones searched pursuant to these warrants.  Instead, she argues that Kaaukai misled the judge and that, had the judges known the true facts, the warrants would not have issued.

**III.   ANALYSIS.**

**A.   Kaaukai Is Not Liable For the Acts of Others, But There Is A Question of Fact With Respect to Whether Kaaukai directed Detective Galario-Guzman to Obtain the Passcode to Tanaka's Phones Without Providing *Miranda* Warnings.**

Kaaukai, the only named Defendant, seeks summary judgment with respect to Tanaka's claim that he was personally responsible for forcing her to provide police with the passcode

12

to her phones without giving her *Miranda* warnings.  Kaaukai says that another officer, Detective LeeAnn Galario-Guzman, was the person who requested and received the passcode from Tanaka.  *See* Kaaukai Decl. ¶ 37, PageID # 447; ECF No. 64-3, PageID # 431 (Incident/Investigation Report listing the full name of Detective Galario-Guzman).  For purposes of the present motions, Kaaukai did not argue that *Miranda* warnings were unnecessary. Accordingly, this court makes no ruling with respect to whether *Miranda* warnings were necessary under the circumstances.

As this court previously noted, Kaaukai is not liable for the acts of others absent some personal involvement in those acts.  *See Ybarra v. Mee*, 2020 WL 4586864, at *5 (D. Haw. Aug. 10, 2020) (noting that there is no vicarious liability for claims asserted under § 1983 for acts of others; instead, supervisors are individually liable only for their personal involvement in a constitutional deprivation); *Young v. City of Menifee*, 2019 WL 3037926, at *6 (C.D. Cal. Apr. 5, 2019) ("the Individual County Defendants may only be liable for their own acts and omissions"); *Haase v. City of Sparks*, 2012 WL 607451, at *8 (D. Nev. Feb. 23, 2012) (holding that a supervisor who played no role in the acts of others was not individually liable).

While there is no longer a dispute that Detective LeeAnn Galario-Guzman was the person who asked Tanaka for the passcode, a question of fact exists on the present record as to whether Kaaukai directed Detective LeeAnn Galario-Guzman to obtain the passcode.[5]  The court cannot tell whether Kaaukai told Galario-Guzman to get the passcode under circumstances in which he should have ensured that *Miranda* warnings were given.  Nor can the court tell where Kaaukai was when Galario-Guzman asked for the passcode.  Thus, this court cannot tell whether he was standing nearby and should have known that *Miranda* warnings were necessary.  The briefs leave this court lacking important facts and without any discussion of the law with respect to whether *Miranda* warnings were necessary.  Nor was this court briefed on

_____

[5] This court had originally thought Tanaka was claiming that Kaaukai had personally forced her to turn over her passcode to her phones.  In Tanaka's Amended Complaint, for example, she declares under penalty of perjury that "Only Derek Kaaukai's name was on the documents.  He directed me to turn over the passwords to unlock my phone[.]"  ECF No. 34, PageID # 187.  Similarly, Tanaka's Opposition to the Motion to Dismiss the Amended Complaint says under penalty of perjury that the "serving officer (also identified as the detective in charge-Derek Kaaukai) . . . demanded turning over passcode to the iphones seized."  ECF No. 28, PageID #152.  Even Tanaka's motion for summary judgment says "Defendant Kaaukai lied when he said the search warrants for my cellphone(s) required [me] to turn over the passcodes to unlock the phones."  ECF No. 60, PageID # 364.  However, at the hearing on the present motions, Tanaka clarified that a female officer (not Kaaukai) allegedly asked her for the passcode at Kaaukai's direction.  Thus, earlier statements attributing conduct to Kaaukai appear to be allegations that Kaaukai indirectly obtained the passcode by asking Detective Galario-Guzman to get it.

14

whether Kaaukai might or might not be liable if he directed
another officer to obtain the passcode under circumstances
requiring *Miranda* warnings.  This court denies Kaaukai's motion
to the extent it argues that he had no personal involvement in
obtaining the codes.

> **B.   Kaaukai Has Qualified Immunity With Respect to
>        Tanaka's Fourth Amendment Claims of
>        Unconstitutional Search and Seizure.**

Kaaukai argues that he has qualified immunity with
respect to Tanaka's Fourth Amendment claims of unconstitutional
search and seizure.  This court agrees.

Qualified immunity shields government officials
performing discretionary functions from liability for civil
damages "insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known."  *Harlow v. Fitzgerald*, 457
U.S. 800, 818 (1982) (citations omitted).  Qualified immunity
provides government officials with breathing room to make
reasonable mistakes in judgment, protecting them unless they are
plainly incompetent or knowingly violate the law.  *See*
*Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).  There are
now ongoing discussions among lawmakers and academics about
whether the law of qualified immunity should be rethought as

providing law enforcement officials to act with too little accountability.  This court issues this ruling based on the present state of the law.

"Qualified immunity is 'an immunity from suit rather than a mere defense to liability.'"  *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  The issue of qualified immunity is therefore important to resolve "at the earliest possible stage in litigation."  *Id.* at 232 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

The Supreme Court has set forth a two-pronged analysis for determining whether qualified immunity applies.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  This court may analyze the two prongs in either order.  *See Pearson*, 555 U.S. at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

In one prong, the court considers whether the facts, "[t]aken in the light most favorable to the party asserting the

injury[,] . . . show [that] the [defendant's] conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201.  Under this prong, this court must decide whether the facts make out a violation of a constitutional right.  *Pearson*, 555 U.S. at 232.

Under the other prong, the court examines whether the right allegedly violated was clearly established at the time of the violation.  *See id.*; *Saucier*, 533 U.S. at 201.  The "clearly established" prong requires a determination of whether the right in question was clearly established in light of the specific context of the case, not as a broad general proposition. *Saucier*, 533 U.S. at 201.

> A Government official's conduct violates
> clearly established law when, at the time of
> the challenged conduct, the contours of a
> right are sufficiently clear that every
> reasonable official would have understood
> that what he is doing violates that right.
> We do not require a case directly on point,
> but existing precedent must have placed the
> statutory or constitutional question beyond
> debate.

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quotation marks, alterations, and citations omitted).  "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light

of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt*, 565 U.S. at 546.

The crucial question is therefore whether Kaaukai could have reasonably (even if erroneously) believed that his conduct did not violate Tanaka's constitutional rights. *See Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). Whether a constitutional right was "clearly established . . . is a question of law that only a judge can decide." *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017).

In the context of alleged violations of constitutional rights involving a search or seizure pursuant to a warrant, a judge's decision to issue the warrant "is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt*, 565 U.S. at 546. Nevertheless, an officer does not have qualified immunity with respect to an alleged Fourth Amendment violation "when it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* at 547 (quotation marks and citation omitted).

In the present case, Kaaukai briefly seized Tanaka while searching her house and seized her phones. These actions were taken pursuant to a search warrant issued by state-court Judge Blaine J. Kobayashi on April 14, 2020, in SW2020-165 and

18

SW2020-166.  This warrant authorized police to search the house in which Tanaka was living and to seize the cellular phone of another person believed to live there, Grindling.  Because the police could not know for sure which of the phones they found in the house belonged to Grindling, all the cellular phones in the house were seized.  The contents of Tanaka's phone were then searched pursuant to a second warrant issued by state-court Judge Adrianne N. Heely, on April 20, 2020, in SW2020-167.  As noted in *Messerschmidt*, the issuance by these neutral judges of warrants based on probable cause "is the clearest indication that [Kaaukai] acted in an objectively reasonable manner."  *See* 565 U.S. at 546.

According to the Affidavit in Support of Search Warrants, the police sought Grindling's cellular phone, believing that videos on the phone would contain evidence of Sexual Assault in the First Degree and Kidnapping, violations of sections 707-730 and 720 of Hawaii Revised Statutes.

In relevant part, section 707-730(1) states that "A person commits the offense of sexual assault in the first degree if: (a) The person knowingly subjects another person to an act of sexual penetration by strong compulsion."  The Hawaii Supreme Court has included penile penetration, digital penetration,

19

cunnilingus, and fellatio in the definition of "sexual penetration" for purposes of section 707-730.  *See State v. Bailey*, 126 Haw. 383, 405, 271 P.3d 1142, 1164 (2012).

Section 707-720 states: "(1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to: . . . (d) Inflict bodily injury upon that person or subject that person to a sexual offense; [or] (e) Terrorize that person or a third person."  The affidavit in support of the warrant applications contained sufficient factual detail for a reasonable officer to have believed that warrants issued as a result were valid.

The affidavit in support of the search warrants indicated that J.B. had told officers that, in November 2016, Grindling backhanded J.B., told her that she could not leave, and then raped her.  *See* ECF No. 64-3, PageID # 458.  The affidavit stated that, in January 2017, Grindling choked J.B., ripped off her clothes, held her down, and put his penis in her vagina.  *Id.* It further stated that J.B. thought Grindling had recorded J.B. giving Grindling "head" in a vehicle.  J.B. indicated that, if she refused to do what Grindling demanded, he would "just grab her."  *Id.*, PageID # 459.  The affidavit in support of the search warrants therefore contained sufficient factual detail for a

judge to have determined that there was probable cause to believe that the phones might substantiate Grindling's commission of violations of sections 707-730 and 707-720 of Hawaii Revised Statutes.

The affidavit in support of the search warrants also indicated that Kaaukai's training and experience led him to understand "that offenders often utilize their cellular telephones to record sexual acts that they commit and store it one the device for years after it was recorded.  They also transfer the material/data to newer or upgraded phone(s)."  ECF No. 64-3, PageID # 460; Kaaukai Decl. ¶¶ 35-36, ECF No. 64-1, PageID # 447.  Kaaukai's affidavit also indicated that J.B. had told police that Grindling had "plenty of videos on his phone with other girls doing 'porn stuff'" and that J.B. believed that Grindling used his cellular phone to record her giving him "head."  *Id.*, PageID # 459.  These facts were sufficient for a reasonable officer to believe that the warrant for the search and seizure of Grindling's phone(s) was properly issued by a judge.

The issuance of search warrants does not end the qualified immunity analysis.  When an officer submits an affidavit supporting a search warrant application that contains facts the officer knows are false (or would have known were false

had the officer not recklessly disregarded the truth) and the false facts are necessary to the finding of probably cause, the officer cannot be said to have acted in an objectively reasonable manner.  In that event, the officer loses the shield of qualified immunity.  *See Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir. 1991), *overruled on other grounds in light of intervening law by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). *Accord Chism v. Washington State*, 661 F.3d 380, 393 (9th Cir. 2011) (holding that it is clearly established that officers who submit affidavits for a search warrant that contain statements they know or should know are false violate a plaintiff's constitutional right not to be searched or arrested as a result of judicial deception, and also ruling that summary judgment on the ground of qualified immunity is not appropriate once a plaintiff makes out such a judicial deception claim).

Tanaka claims that Kaaukai deceived the judge in the applications for the warrants at issue.  But Tanaka's claims of deception do not raise an issue of fact with respect to the probable cause underlying the search warrants.  Based on police investigation reports, Tanaka argues that Kaaukai misled the state court judge with respect to the warrant applications. Leaving aside the inadmissibility of those reports given the

hearsay in them, those same reports dispel Tanaka's arguments. In the discussion that follows, this court mentions facts stated in those reports not to establish those facts, but instead to evaluate Tanaka's claim of judicial deception with respect to the issuance of the search warrants.

For example, Tanaka argues that there were some inconsistencies in what J.B. told police.  J.B. told the first officer investigating the alleged rapes and kidnappings that, for two weeks in November 2016, she was held against her will with a gun against her head and raped.  She related that this also occurred off and on until January 2017.  *See* ECF No. 60, PageID #s 366-67 (Incident/Investigation Report for Case No. 18-001587). Tanaka says that J.B. changed her story when she talked with Kaaukai, leaving out any mention of a gun or of being held for two weeks.  However, those alleged inconsistent statements are not sufficient to dispel the probable cause.  As Kaaukai notes, "victims of sexual assault suffer tremendous trauma, which also has a neurological impact that can lead to having inconsistencies in memory, provided what might appear to be inconsistent statements at different points in time."  Kaaukai Decl. ¶ 17, ECF No. 64-1, PageID # 445.  Moreover, it was not necessary for Grindling to have used a gun or to have held J.B. for two weeks

to have violated section 707-730 or 707-720 of Hawaii Revised Statutes.

Additionally, other people mentioned to police that Grindling had used a gun to threaten them.  For example, on January 12, 2018, Detective Oran Satterfield interviewed K.C. at the Hawaii Youth Correctional facility.  K.C. said that Grindling touched J.B. and made her do stuff she did not want to do.  K.C. told Satterfield that J.B. had told K.C. that Grindling got "physical" with J.B.  K.C. believed J.B. "because GRINDLING held a gun to [K.C.] before."  ECF No. 60, PageID # 371.

Tanaka takes issue with the affidavit describing Grindling as J.B.'s pimp, arguing that J.B. did not identify Grindling as J.B.'s pimp.  *See* ECF No. 60, PageID # 361.  But Kaaukai explains that J.B. told her therapist that Grindling was her pimp.  Kaaukai Decl. ¶ 18, ECF No. 64-1, PageID # 445; *see also* ECF No. 60, PageID # 366.  In any event, whether Grindling was J.B.'s pimp is irrelevant to whether he violated section 707-730 or 707-720 of the Hawaii Revised Statutes.

Tanaka says that, although J.B. identified Tanaka as a witness, Kaaukai made no attempt to contact Tanaka before applying for the search warrant.  Tanaka says she was in jail at various times in 2018 through 2020.  *See* ECF No. 60, PageID #s

24

362-63.  Tanaka does not demonstrate that she has personal knowledge of Kaaukai's actions with respect to attempting to interview her.  In any event, Kaaukai says he tried to locate Tanaka and even called her phone.  He says that, after he identified himself, the person on the other end of the phone hung up.  Kaaukai Decl. ¶ 20, ECF No. 64-1, PageID # 445.  Kaaukai says that he did not believe that getting Tanaka's statement was imperative, "as she could have tipped Grindling off that he was under investigation," leading to the possible destruction of evidence.  *Id.* ¶ 23, PageID # 446.  Moreover, J.B.'s statement to the police did not indicate that Tanaka was present during either of the alleged rapes or kidnappings, which allegedly occurred before Tanaka went to prison in 2018.  To the contrary, J.B. expressly said that after she was raped by Grindling for a second time in January 2017, they then drove to pick up Tanaka.  *See* ECF No. 60, PageID # 368.  Accordingly, Tanaka has demonstrated no personal knowledge of the alleged rapes and kidnappings.

Tanaka says that the police reports indicated that J.B. said that J.B. and Grindling would communicate via messenger and text messages but that Kaaukai made no attempt to obtain those messages.  *See* ECF No. 60, PageID # 362.  Again, Tanaka lacks personal knowledge with respect to what efforts Kaaukai may have

used to verify the messages.  Kaaukai, on the other hand, says that he was told that the phone J.B. was using at the time belonged to Grindling, who took it back and gave it to Tanaka. Kaaukai also indicated that he searched J.B.'s Facebook messenger account, but did not find any conversations between J.B. and Grindling.  *See* Kaaukai Decl. ¶ 25, ECF No. 64-1, PageID # 446.

Tanaka says that Adam Kingston Mendez-Ancheta did not corroborate any alleged rape or kidnapping when he spoke with Kaaukai.  *See* ECF No. 60, PageID # 362.  However, J.B. did not say that anyone else was present during any of the alleged rapes or kidnappings.  Kingston apparently did give Kaaukai a reason to get a warrant for Grindling's phone, telling him that "Grindling video tapes the sex that he has with girls and he gives them drugs for sex."  *See* Kaaukai Decl. ¶ 28, ECF No. 64-1, PageID # 446.

Tanaka incorrectly argues that probable cause is belied by the fact that the dwelling searched and phones seized and searched were not in existence at the time of the alleged rapes and kidnappings.  *See* ECF No. 60, PageID # 363.  As Kaaukai states in his affidavit in support of the search warrants, "offenders often utilize their cellular telephones to record sexual acts that they commit and store it on the device for years

after it was recorded.  They also transfer the material/data to newer or upgraded phone(s)."  ECF No. 64-3, PageID # 460; Kaaukai Decl. ¶¶ 35-36, ECF No. 64-1, PageID # 447.  In other words, just because someone gets a new phone, that does not mean that evidence of crimes committed before the new phone was obtained will not be on the new phone.  Similarly, even if a searched dwelling did not exist at the time of a crime, evidence of the crime might still be found on a cellular phone in the dwelling.

Tanaka contends that J.B. told her that no rape or kidnapping occurred.  Whether J.B. subsequently denied that the rapes or kidnappings occurred does not affect the probable cause determination at the time the warrants issued.  At that time, the police had J.B.'s statement that Grindling had raped and kidnapped her.  Even if J.B. had a motive to improperly accuse Grindling of the rapes and kidnappings, that does not, without more, dispel the probable cause established by J.B.'s statements that evidence of sexual assault and kidnapping were on Grindling's phone(s).  Tanaka provides no evidence that Kaaukai knew or should have known of any alleged fabrication.  On a motion for summary judgment, the movant must do more than speculate.

In her Reply, Tanaka argues that probable cause could not be based on uncorroborated statements by J.B. *See* ECF No. 67, PageID # 467. However, unlike the cases cited by Tanaka involving informants, the Ninth Circuit does not require the reliability of victims to be demonstrated before a search warrant may be issued. *See United States v. Mahler*, 442 F.2d 1172, 1174 (9th Cir. 1971). The Ninth Circuit has explained that, presuming that a witness is "fairly certain" of the identity of the offender, "Where the source of police information about a suspect is an eyewitness to the crime, probable cause to arrest the suspect may exist even in the absence of an independent showing of the reliability of the source." *United States v. Hammond*, 666 F.2d 435, 439 (9th Cir. 1982). Here, J.B. identified Grindling by name and picked him out of a photo line-up.

Because Kaaukai acted reasonably pursuant to search warrants and because Tanaka fails to raise a genuine issue of fact with respect to whether Kaaukai deceived the state-court judges with respect to the search warrant applications, Kaaukai has qualified immunity with respect to Tanaka's Fourth Amendment claims. *See Devereaux*, 263 F.3d at 1074 (noting that the crucial question is whether an officer could have reasonably (even if

28

erroneously) believed that his or her conduct did not violate constitutional rights).

**IV.      CONCLUSION.**

The court denies Tanaka's motion for summary judgment. The court grants in part and denies in part Kaaukai's counter motion for summary judgment, ruling that Kaaukai has qualified immunity with respect to the Fourth Amendment claims asserted in the Amended Complaint.  However, because this court cannot tell from the present record whether Kaaukai directed another officer to obtain the passcode to Tanaka's phones without providing *Miranda* warnings, or whether *Miranda* warnings were even required, the court denies Kaaukai's counter motion for summary judgment with respect to the Fifth Amendment claim asserted in the Amended Complaint.

The court orders the parties to contact Magistrate Judge Rom Trader to schedule a settlement conference.  The contact should be made within a week of the issuance of this order, although the settlement conference, may, of course, occur after that.  Before incurring further expenses with respect to Tanaka's Fifth Amendment claim, the parties should discuss settling that claim, keeping in mind any limitations on Tanaka's potential damages with respect to that claim.  The provision of

the passcode led to an examination of the contents of Tanaka's phones but also allowed the police to return the phones on April 24, 2020, ten days after they were seized.  *See* ECF No. 56-7, PageID # 352.  Whether the phone's contents could have been viewed by police even had Tanaka not provided the passcode is not clarified by the record.


            IT IS SO ORDERED.

            DATED: Honolulu, Hawaii, May 13, 2021.



                        /s/ Susan Oki Mollway

                        Susan Oki Mollway
                        United States District Judge


*Tanaka v Kaaukai*, Civ. No. 20-00205 SOM-RT; ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S COUNTER MOTION FOR SUMMARY JUDGMENT